We are glad that you're here, and we assume that you understand the lighting system. When the red light comes on, please wrap up your thoughts. We'll call the first case, number 22-10100, Liggins v. Duncanville TX, and we'll hear first from Mr. Coyle for Liggins. Good morning, Your Honors. May it please the Court, John Coyle for Appellant Lou Liggins. I'd like to reserve three minutes of rebuttal time. Following the Supreme Court's denial of certiorari and Herrera, the only issue remaining before the Court is the District Court's dismissal at the pleading stage of the City of Duncanville. This case, as you know, stems from the shooting of Lou Liggins. Mr. Liggins was an individual in severe mental distress when police responded to his home. Mr. Liggins, as police were informed both by police radio and by word of mouth, was unarmed. There was no one else in the home. He was not wanted for any crime, nor was he threatening anyone other than perhaps himself. On the scene, the Duncanville Chief of Police took control of the scene and ordered officers into the facility, and that is sort of what is the main issue here, is whether the Chief of Police on the scene was a policymaker for municipal liability purposes. In Proprocknick and Pembauer, the Supreme Court has informed us that a municipality may be liable for the single decision of a policymaker when that decision is taken within the sphere of their authority. What is the policy here? It's a single decision, so it's not actually a policy. It's the decision to send officers who are not equipped to deal with mentally ill individuals, who are not equipped with the proper tools, into a facility, into a home, to seize him with force in contradiction of all of the studies and science that is known to police chiefs in Texas. Was there an affirmative decision to do that, or are you really arguing there was a lack of a decision to do one of those options or take some of those measures that you just listed? Well, so part of this is whether the chief was deliberately indifferent in making his decision in sending those officers into the home. So when we look at deliberate indifference, we're looking at whether a decision was made among a choice of alternatives. And so we have to look at what other alternatives were available to the chief to find out whether there was deliberate indifference. But that's downstream of the policy question. Sure, absolutely. But they sort of, they tie back and forth together, and it's impossible to talk about one without the other. I guess I'm just grappling with what the decision was, because it seems like what you're talking about is an omission, less a decision or a policy decision. It's the decision to send officers who are ill-equipped and ill-trained in to forcibly seize an individual. That's the decision that was made. So what should he have done? Well, that's where we get back into the deliberate indifference issue. He should have, every municipality in Texas is required to have officers trained for dealing with individuals in crisis. Those officers were available to him. He stated, at least to the plaintiff's mother, that there was a negotiating team that he could bring to the scene and would use. He could have used that. There were less lethal tools, like tear gas tasers. He could have sent in officers equipped with those. And he could have utilized many of those techniques that the Texas Judicial Commission on Mental Health has espoused, not using those affirmative commands that work in normal police interactions, because they only serve to exacerbate the issue and lead to violence. So there's a bunch of... Did that team show up after the shooting? I'm sorry? Did the team that you're referring to, did he send that after the shooting? You don't know. And they were just late getting there? Or he just... I don't know, Your Honor, because we're at the pleading stage and could not get any information before pleadings. So that's another part of the... I mean, you have a client. You could ask the client who was there. The client was in severe mental distress at the time and was shot. His recollection of the incident is murky at best. Most of our information came from his mother, who was on the scene. She was there? His mother, yes. Yeah, so you could ask her. But she wasn't inside. It's my understanding that no hostage negotiating team or anything of that sort was utilized in the incident. Okay. So... How can we tell, so the chief is either a policymaker or not, where are we to look in the law? Now, I'm not talking about cases. I'm talking about state law or the relevant, you know, whatever it is, the local law, to tell us who the policymaker is. Right. So that's really one of the major sort of headbutts in this case, because you have a makes this grand declaration. But that declaration then sort of is undermined by more specific statutes later. In Chapter 15, Section 5, it puts the chief in charge of ensuring that officers have the proper tools and equipment for carrying out the job. The chief is responsible for making sure they have less lethal tools, things of that nature. Also in Section 5, the chief is responsible for assigning officers duties and telling them how to render service. And the language in that section is really important. It says, whenever and wherever, in his opinion, the occasion shall require. There's this obvious delegation of authority of how to police. But isn't that operational authority, and isn't that distinct from policymaking authority? So what the case law has told us about the difference between this decisional operational authority and policymaking authority is that that decisional authority can be, or is, policymaking authority when it's not constrained by policies made by someone else. But the city manager could overrule the police chief any time. One of the issues here is this is on-the-scene management, on-the-scene decision-making. But decision-making's not policymaking. That's back to my previous question. One of the things that we always see, and one of the things the Supreme Court points out in Procnak is there's always going to be a governmental body that then hands out power as it sees fit. And that governmental body will always retain the ability to terminate someone for not doing what they like. So there's always oversight. That doesn't necessarily mean that that eliminates policymaking authority. What we have is whether that chief is constrained by outside policies made by others. And there's no evidence in the record, at this stage at least, and part of the difficulty is this is the pleading stage, that he's constrained by any other policy. The only evidence we have here is that there's this affirmative grant of authority that is then utilized in making these decisions that lead to Mr. Ligon's shooting. What's your best precedent that sort of maps onto these facts that would say the police chief is a policymaker? So I think the best case really is Penn Bower. And one of our court's cases, the Fifth Circuit's case, is Val, is sort of similar but different, and the difference really highlights why Penn Bower applies more correctly. So in Penn Bower, you have a bunch of sheriff's deputies who are responding, and they call and they ask, should we enter this property? And they call the district attorney, and the district attorney says, yes, you should enter that property. And the appellate court there and the Supreme Court did not quarrel with their decisions. That decision wasn't just legal advice, it was an affirmative order in that case to enter that property. Sorry, who's the, I guess, two questions in Penn Bower, because I don't remember the facts of that case. Why were they calling the district attorney, or was it the city attorney or something like that? It was the district attorney. Okay, the district attorney. Why were they calling the district attorney to ask for a policy? They were serving a writ, and the decision was whether they could enter the property to serve the writ or not. So the defense was that they were merely asking for legal advice, that this wasn't a full policy. And the Supreme Court, and the appellate court and then the Supreme Court said, no, the DA said, enter the property. That is final policy making for which the municipality can be held liable. And when you contrast- That's right, that's different though, right? Here we don't have a sort of a city attorney official saying, look, this is, legally speaking, this is what you need to do. Go ahead and do it. Right? Well, we do. We have the chief of police. And I think what highlights that difference is this court's reasoning in Val. Because in Val, we had basically the same as this, a mentally ill individual, and they call, and they get discretion from a captain. That captain, and our court's reasoning in that, was not a policy maker because he was constrained by the policies that are in existence governing that police department. That Dallas had put in existence that restrained him. And if he varied from that, well then that wasn't an act of the municipality. Here we don't see, at least in the record at this stage, any policies that are governing how the chief is to handle these situations, dealing with mentally ill individuals. All we see is a delegation by city council of discretionary, final authority to render services however he sees fit. And without that constraint, that external constraint of a separate policy, he is effectively the final policy maker in this. All right. Now you'd also have to show that whatever the policy is here, and I'm still a little murky about what precisely the policy is, but you'd have to show it's the moving force. Right? So how have you alleged that? So in these single incident cases, it's not effectively a policy. It's the decisions that were made become the policy. And the Supreme Court has said that if it's a final policy maker, even if they're just making a decision one time and they don't mean those decisions to last forever, that can still hold the city liable. So we're looking at the decisions of the chief here. So what we have is the deliberate indifference standard. Whether this decision was deliberately indifferent and whether that decision- That would be the next step. We've got the policy maker question here, then we've got, all right, if there is a policy in this one decision, was it deliberately indifferent? And those are the two elements that you need for the single incident municipal liability. So if we have deliberate indifference, which is actual knowledge or should be knowledge, if a normal individual in that position should know this result is likely to follow, that's deliberate indifference. So in this case, we have- It's a lot like negligence. It's just a step beyond negligence. It's more than that, right? It's more than negligence. Yeah, it's a step beyond negligence. It's, I apologize, I don't have- No, I think the standard you have to meet is beyond negligence, but what you're talking about sounds like negligence on the part of the police chief. Well, it's knowledge that the result is substantially likely to follow. And the way that we get there with the police chief is by some of the things that he should have known. Obviously- Is there any allegation that the police chief told the officers, I know we should have a negotiating team, but y'all just go in, or anything like that as far as the police chief's actual affirmative order? There are allegations that he told Ms. Brown, Mr. Ligon's mother, that he would bring a negotiating team. But what about chief to officers who executed his decision? That information simply can't be known. Is it alleged in the complaint? It's not, but plaintiff would have no way of alleging it without a basis for it. All we have is that he told the mother that a negotiating team would be brought. We have the Texas Judicial Commission saying that you have to deal with people with mental health issues differently, or it's more likely to end in violence. We have the Texas law that creates mental health officers for these exact situations, and none of those tools being utilized by the chief. So what if- Go ahead. If he sent in the negotiating team, those are policemen, right? Yes. And so I would imagine they would be armed, and if Mr. Ligon's was reaching in his pocket for his cell phone, but they could have thought it was for a gun, seems like the same thing would have happened. Well, I think there's a lot to break down there. One is that the officers knew he was unarmed, or were at least informed beforehand that he was unarmed and that there were no firearms in the house. How much credit they're going to give to that is obviously a different issue. We couldn't possibly expect officers simply to take the word of whoever's saying it, even if it's true. No, I understand that. To get to your point about the negotiating team, it may have been a situation where if the negotiating team was utilized and not sent into the home, that he came out and surrendered. The decision was made to use physical force to seize Mr. Ligon's when he was not a threat to himself or anyone else. He was merely in mental crisis, and to not utilize any of the mental health tools that Chief Brown should have known were the right tools to be used. That's sort of the issue in the case. What are the allegations with respect to how the officers entered the house or approached the house? Do we have allegations about that? I don't recall. We don't, because they're not known to us. What we have, we know that a team of officers went in. We know that at least one was equipped with a firearm. How many officers? Do we know that? We don't know that information either. Rights and requests pre-suit were denied and things of that nature. So we don't have a lot of information about the actual incident, but we know that at least multiple officers went in. We know that they were equipped with firearms. We know that they were conveyed the same information that was conveyed to the chief, that there was no one else in the home, that Mr. Ligon's was not threatening anyone, he was not suspected of any crime, and that he was in mental distress. That's sort of the entire world of information that's known. Is that precise? I mean, I know I can go read the complaint, but was it precisely conveyed to them he was in mental distress? Were those the words that were used? Yes. Okay. Yes. So just to, I think, tie in this deliberate indifference aspect, because I think that's where it seems to be we're hung up to a certain degree. Part of the deliberate indifference case, a large part of it coming out of the Supreme Court, is about time to make decisions and choosing among various alternatives. And what we have in this complaint, among the difficult and somewhat sparse facts, are pleadings that show a number of alternatives that were available to the chief of police. The hostage negotiating team that he said he was going to bring, the mental health officers that he is required by law to have on his police force, less lethal tools, pepper gas, tasers, et cetera. All of these tools were available, and yet the decision was made to end the knowledge that using those affirmative, stop, show me your hands type commands in normal police interactions, those types of commands sort of backfire in the mental health realm. Did you originally bring a failure to train claim in this case? Was that ever an issue in this case, failure to train the officers? We did not, and it sort of goes hand in hand there. If we had, like in Val, a captain and not the chief on the ground making these decisions, we would have brought a failure to train claim, because then it would have been the responsibility to train those officers on the policies on the way in which this is supposed to be done. Here we have the policymaker, the person responsible for telling officers how they're supposed to render service. He was leading the show. We didn't believe that you could fail to train the policymaker, and given that it was his decisions that led to... I meant a failure to train the officers to go in and handle a mental health situation. No, that claim was not made, because they were, like I said, following the direction of the chief. Okay. I thought there was a claim made in one of the prior complaints. It was, but it was abandoned without briefing. Okay. Well, you have three minutes for rebuttal, Mr. Coyle. Thank you. Mr. Jeffrey for Duncanville. Good morning. I'm Jim Jeffrey, and I have the honor of representing the city of Duncanville and Officer Roach. I would like to start with plaintiff's best case. They were asked, what is your best case? Pembauer and Valle. Pembauer had a state statute that gave decision-making authority to the local prosecutors when the police had a question about what to do. The Supreme Court pointed to an Ohio statute that the officers could rely upon and contact the prosecuting authority and ask them what to do. And so the Supreme Court in Pembauer said, in that context, the prosecuting authority was a policymaker. So we don't have anything like that here. So Mr. Coyle was pointing to some, I don't know if they're statutes or ordinances, that he says delegate authority to the police chief in some way. Is that, are those analogous to what you're talking about in Pembauer, or are they different? They are not analogous. The operational rules that are relied upon by the plaintiff here allow the police chief to operate the police department. And Judge Duncan, as you questioned, the city manager can oversee and basically tell the police chief not to do something or to do something. So the chief is subordinate to the city manager. And I would like to point to the Valle case in the city of Houston that Mr. Coyle mentioned. In that case, you had a captain on the scene that, under the general orders, had operational control of the scene. And the argument was made in that case that because the captain had operational control of the scene, he became a policymaker for the decisions that he made. And the court, this court, said no, he didn't. Operational control and decision-making doesn't equate to policymaking. And so the, you know, if you take the argument that's being made here about operational control at the scene equating to policymaking, because after all, you have a decision to do something or the authority to make a decision to do something, that would make every police officer in the department a policymaker. You know, I do a lot of work for different departments. I have relatives and a son who are police officers. It is routine for police officers to operate by themselves on the street and make stops and then have to take action when they're making a stop. And under the analysis we've heard here today, each and every one of those people who have the authority and the discretion to take action would become a policymaker. Every sergeant who arrives to take command of the scene as a supervisor to help out would become a policymaker. So this court has said it takes more than just the ability, and I'm referring to the Bolton case, it takes more than just the authority delegated to a public official to carry out a function in a certain area. They have to have non-reviewable authority. And so if you look at it from the standpoint of going all the way back to Monell, which interestingly, you know, Monell reversed an earlier Supreme Court case, Monroe v. Pate, where he used not to be able to sue cities and local governments. But when Monell came out in 1978 and said, these are the requirements to sue. If you're going to pursue a claim, you have to have a policymaker who promulgates a policy that is the moving force behind a constitutional violation. And it rejected respondeat superior liability. There are tens of thousands of cases at the district and appellate levels over and over and over rejecting respondeat superior liability and requiring that in order to get to a municipality or get liability on a municipality, you have to establish a policymaker's policy that was the moving force. And, you know, the question here was, what was the policy? That was asked by Judge Wilson. What was the policy? And we heard something that surprised me, that the policy was sending in officers who weren't adequately trained. And yet, at the district court, and I refer specifically to record on appeal, page 253, footnote 1, and the district court's memorandum opinion and order at page 272 of the record, where it was recognized that the plaintiff was not making a failure to train claim. The plaintiff withdrew any failure to train claim. And so now we hear that the basis for this policymaker decision that made a constitutional violation occur is a failure to train. But at the district court, they conceded they didn't have enough facts to support a failure to train claim. And under Lookingville, which we cite in our brief, if you didn't brief and argue that in the district court, you can't raise it in this court for the first time. And the other concession that I think is important, we heard today over and over that the city is being sued for Chief Brown's decisions. And yet, in the appellant's opening brief at page 19, they say, and I quote, they do not assert Chief Brown's decisions were unconstitutional. So I'm puzzled. What exactly is the city being sued for? And procedurally in this case, the plaintiff filed an original complaint and the city ended up filing three motions to dismiss. And in the face of motions to dismiss, the district judge allowed the plaintiff to amend and replead multiple times. So the third amended complaint, which is the one that is the basis of this appeal, was actually the plaintiff's fourth attempt to state a case. And here we are. We still don't know what they're suing the city for. They've conceded. What about the alleged statements the chief made to the, I guess, victim's mom? We'll send in a negotiating team. And mom tells the chief, or tells the police department, he's not armed, he's not dangerous, he's just having a mental health crisis. I mean, what do we make of those allegations? Well, if you reach all the way through the policymaker issue and you're looking at the potential liability of deliberate indifference, the district court correctly recognized those statements are the opposite of deliberate indifference, that the chief was going to try to do something if he, of course, had the opportunity. And so the district court said, you know, the fact that the chief acknowledged he had a hostage negotiation team or a team dealing with a similar crisis but didn't get to utilize it for whatever reason doesn't show deliberate indifference. It shows that there was a conscious attempt to use a tool available. And so that is the opposite of deliberate indifference. Deliberate indifference, you know, the standard for that requires a showing that the purported policymaker had a known risk that there was going to be a constitutional violation and despite the known risk did nothing to try to address the constitutional violation. And using that analysis, Judge Scholar agreed that the fact that the chief was aware and had a negotiation or negotiating team that he was hoping would be available, demonstrate there was no deliberate indifference. But then again, I go to the concession that was made in the plaintiff's opening brief here that says the chief's decisions were not unconstitutional. And that's at page 19 of their opening brief. So yes, I make much of that. I think it's important that the chief recognized, you know, we have a team and we can use them if we can. The thing I urge the court to look at, earlier I was talking about the Monel requirements. There must be a moving force behind a constitutional violation, the policymaker's policy. There's almost no discussion in the district court and there is no discussion here of the surrounding facts involving the use of force. And we pointed out in our brief, in our appellee's brief, that the plaintiff didn't allege in this court really that there was a constitutional violation. There's no discussion of the Fourth Amendment standards and how those standards were violated. And at the district court, in each of the three motions to dismiss, I argued that there was no showing, it was only conclusory and therefore there was no showing of a Fourth Amendment, unlawful seizure or unlawful use of force. And so here, if you look at what has to be broken down and what has to be shown, we still haven't heard what was the constitutional violation that was supposedly caused by the policymaker's policy. And all we know, the facts are very sketchy, all we know is the police respond to some sort of significant incident, that's my summary of what we know about the plaintiff's allegations. And in the course of that response, with people on the scene, this man reaches into his pocket, allegedly for a cell phone, and that's when he shot. And that's all we know, that's all we're told. We're not. Do we know whether he was killed or not? He was not killed. Do we, we don't know that? He was not killed. Okay. Was there a cell phone? I think it turned out there was a cell phone. But, and again, outside the record, there's no, of course, mention anywhere in the record, except in the footnote that I put in, that he was also brandishing a large kitchen knife. And I put that in, not because this court can consider that as justification for the actions at the scene, but to illustrate the absence of facts. But we can't go by anything but the pleadings here. Those are. Right. You can't. You cannot go past the pleadings, but the pleadings are not adequate. There is not, there's not enough in the pleadings alleged to show the totality of the circumstances surrounding when the officer fired. Other than. That's neither here nor there for Rule 12. In a Rule 12 proceeding, 12E6 proceeding, yes, Your Honor. I mean, I take your point that we're, I don't think we're talking about the actual use of force here. We're talking about something else. And that, that may be correct that we're talking about something else, but if the underlying constitutional violation is the use of force, and one of the requirements of showing liability on the basis of a policymaker is that their policy was the moving force, you can't ignore the use of force. And so the, it is incumbent upon the plaintiffs to establish a constitutional violation caused by or that was the result of the, of the policymaker's policy. Right. So we can't ignore it, but that has been ignored. And so the, you know, the, the concern is, and again, Judge Wilson asked, I think, the first question, what is the policy? And the response was the policies were the decision, the single decision or decision made by the chief, but we have a concession at page 19 of the appellant's brief that the chief's decisions were not unconstitutional. And so we keep, we, we go into a circle because we hear that the, in the opening brief, that the chief's decisions were not unconstitutional, and yet, in argument, we hear that the policy is the chief's decision. And it, it doesn't make sense. And the, when you also look at the concession, that there was no factual basis to support the training claim, and yet we hear today that the chief's decision to send in untrained officers is the unconstitutional policy. I, I'm at a loss to understand how the plaintiffs are trying to make a claim. If you concede you don't have a training claim, and then the policy is you sent in untrained officers, you can't have it both ways. And that's what, what's the city facing? And that's the, you know, back to, as I was saying, at the district court, the plaintiff was given, you know, three opportunities after the initial complaint to try to state a claim. And the district judge gave them opportunities and ultimately concluded you haven't stated a claim. And. Do we know whether any of those other officers, not the one who shot him, but the other one accompanying him, were they trained in dealing with mentally deranged people? We actually, again, we're outside the record, but to my understanding, that multiple officers at the scene were trained as mental health officers, including Officer Roach, who fired the shot. And again, but that's outside the record. But to answer your question, that is my understanding. Yeah. And, you know, I, I've tried to address the questions that the court raised. I would start repeating myself. Well, no need to do that. No need to do that. If the court has any questions, I'll be happy to try to answer them. But otherwise, I think I've covered all the territory I plan to. Other than just on behalf of Officer Roach, it appears that there's no dispute but that the statute of limitations bars the claims against him. Thank you, counsel. I give you back four minutes and 18 seconds. We are grateful. I'll take it. Mr. Coyle, you have some time for rebuttal. Thank you. I think it's important first to talk about this aspect of our brief where we say the decision is not unconstitutional. So the deliberate indifference test, there's two ways, there's two requirements under Webb versus the town of St. Joseph. The plaintiff must demonstrate either that the final policymaker's decision was fashionably unconstitutional or adopted with deliberate indifference to the known and obvious fact that such constitutional violations would result. It's not fashionably unconstitutional. It would be disingenuous to say it was. Yeah, you're saying that the hook is the alleged deliberate indifference. Yes, we can see that the decision was not fashionably unconstitutional, but we're saying that it was deliberately indifferent to the known result. The second thing that I really think I need to address is this thought about abandoning the failure to train claim. The failure, the untrained officers, the sending in of untrained officers, that failure to train element, that's but one of a part of the matrix that goes into the decision made by the chief. So while we may not have had enough to make a failure to train claim, which you know requires evidence of prior incidents and- Yeah, it's hard to do that on a single incident. While we might not have had enough to make that, this sending in untrained officers in conjunction with the other failures that we already discussed, we believe, demonstrates the deliberately indifferent decision which would support a single incident claim. And finally, there's been a lot of discussion about facts that are outside the record. If there was more transparency, we may never be here, but we are where we are and we pled what we need to to the best of our ability. I mean, I think we realize the stage of, the procedural stage that we're at. Unless you have any questions, you'll have more time. Thank you, counsel. Thank you. Thank you both for a well-presented argument. We'll take that case under submission.